Andrew F. Kay and Mary M. Kay v. Commissioner.
Kay v. Commissioner
Docket No. 5547-69.
United States Tax Court
T.C. Memo 1971-173; 1971 Tax Ct. Memo LEXIS 159; 30 T.C.M. (CCH) 745; T.C.M. (RIA) 71173; July 22, 1971, Filed *159 Clyde R. Maxwell, for the petitioners. Allan D. Teplinsky, for the respondent. RAUM
Memorandum Findings of Fact and Opinion RAUM, Judge: The Commissioner determined the following deficiencies in petitioners' income tax for the calendar years 1965 and 1966: Year
Deficiency
1965
$84,103
1966
7,132
Two issues remain for adjudication: (1) What was the fair market value of 100,000 shares of Delta Design, Inc., on May 8, 1965, when petitioner Andrew F. Kay sold such shares to his wholly owned corporation, Non-Linear Systems, Inc., for $275,000? The Commissioner had determined that those shares had a fair market value of $138,200 and that the excess of the sales price over that value, namely, $136,800, constituted a dividend from Non-Linear Systems, Inc. (2) Did petitioners in fact make a charitable gift of certain real estate in 1966? A stipulation of facts filed by the parties is incorporated herein as part of our findings of fact. 1. Petitioners are husband and wife. They resided in Del Mar, California, when the petition herein was filed. Andrew F. Kay ("petitioner") has been the sole stockholder of Non-Linear Systems, Inc. ("N. L.S.") since its *160 incorporation in California in 1953. Delta Design, Inc. ("Delta") was incorporated under the laws of California in 1959. It was the successor to a two-man partnership composed of Trigg Stewart and David Comey, both of them unrelated to petitioner. Its authorized stock was fixed at 600,000 shares in 1961, of which 500,000 shares were issued: 200,000 shares each to Stewart and Comey, and 100,000 shares sold to the public at $4.50 a share. In authorizing the public sale of the 100,000 shares, the California Corporations Commissioner required that the 400,000 shares issued to Stewart and Comey were to be nontransferable without prior approval of the Corporations Commissioner and were to be subject to various restrictions including ineligibility to receive dividends until dividends in 746 specified minimum amounts had been paid upon the unrestricted shares. In February 1962, 100,000 of the restricted shares were released from the restrictions. Sometime in 1961 Stewart's wife obtained a divorce, and as part of the property settlement agreement she received 100,000 shares of Stewart's Delta stock. During this time relations between Stewart and Comey became strained. In July, 1962, *161 petitioner purchased 40,000 shares of Delta stock from Mrs. Stewart for $1.25 a share, and at about the same time Comey sold 150,000 of his restricted shares: 25,000 to petitioner and 125,000 to 15 other persons, including 65,000 to eight persons who were then friendly to petitioner and who could be characterized as constituting or being part of the "Kay group." The sales by Comey were at $1.25 or $1.50 a share. Petitioner was interested in acquiring control of Delta, primarily because it manufactured products that were related to N.L.S.'s products, and N.L.S.'s distribution system could be profitably employed in selling Delta's products. At about the time of petitioner's foregoing acquisitions of Delta stock in July, 1962, strained relations developed between him and Stewart. The difficulties between them were resolved when on or about September 5, 1962, petitioner purchased Stewart's 100,000 shares (75,000 of which were restricted and the remaining 25,000 unrestricted) for $275,000. The Delta shares acquired by petitioner and his group were sufficient to enable petitioner to obtain control over Delta, and a marketing agreement was entered into between Delta and N.L.S. whereby *162 Delta's manufactured products were to be distributed through N.L.S.'s distribution system. The following schedule reflects the comparative sales and net income of Delta, the dividends paid by Delta and the earnings per share and book value of the outstanding shares of Delta stock for its fiscal years ended November 30, 1961 through November 30, 1965: Year
Sales
Net Income
Dividends
EarningsPer Share
BookValue
1961
$ 757,224.19
$82,748.31
$0
$.1655
$ 1.30
1962
996,831.00
66,402.00
45,000
.1328
1.34
1963
889,319.00
50,862.00
22,500
.1017
1.39
1964
954,379.00
24,613.00
45,000
.0492
1.36
1965
1,203,581.00
55,270.00
45,000
* .115
* 1.34
From the time of the public issuance through and including all times material herein, the bid and ask prices of the Delta stock were listed in the over-the-counter stock quotations in the Financial Sedtion of the San Diego Union newspaper. A transcription of the foregoing bid and ask price listings from August 9, 1961 through *163 May 11, 1965 discloses a gradual decrease in quotations generally from 4 1/8 bid and 4 7/8 ask in 1961 to 1 1/2 bid and 1 7/8 and 2 ask in April and May, 1965. These quotations related to Delta's unrestricted stock. The record contains the annual bid and ask price range of the Delta public shares listed in Walker's Manual of Far West Corporations, as shown in each of its volumes for the years 1962-1965, respectively. The record also contains the bid and ask or want and offering prices of the Delta public shares as well as the brokers involved in the transactions resulting in the quotations as listed semiannually in the National Stock Summary Books for the period April 1, 1961 through October 1, 1965. On or about May 8, 1965, petitioner sold to N.L.S. for $275,000 the 100,000 shares (75,000 restricted and 25,000 unrestricted) of Delta which he had purchased from Stewart in September, 1962. The Commissioner determined that these shares had a fair market value of $138,200 on the date of petitioner's sale to N.L.S. and treated the difference, namely, $136,800, as a taxable dividend. We heard extensive testimony in respect of the fair market value of these shares as of May 8, 1965, and *164 after evaluating that testimony and considering the stipulated materials, we have concluded that these 100,000 shares had a fair market value of $200,000 on that date. We so find as a fact. At the end of the trial we announced our finding and indicated some of the considerations that we took into account in reaching that result. It would serve no useful purpose to restate 747 those considerations or to review the voluminous materials in the record that led us to that conclusion. Suffice it to say that the matter is not one that is susceptible of the application of any precise mathematical formula, nor is any one particular factor conclusive. We have taken the entire record into account. 2. In petitioners' 1966 return a deduction of $12,907 was claimed in respect of an alleged charitable gift of an interest in real property. The Commissioner disallowed the deduction in its entirety. Petitioners now concede that the property had a fair market value of only $9,000. However, at issue is whether they made the gift at all in 1966. The evidence discloses that a deed dated December 28, 1966, was executed in respect of the property and that petitioners' books contain entries for 1966 *165 relating thereto. The Government contends that the deed was never delivered in 1966. The evidence relating to this issue was most unsatisfactory. The deed was never recorded; it remained in petitioners' possession, and we are far from satisfied that there was any effective delivery of the deed to a representative of the charitable donee, as contended by petitioners. The evidence in support of petitioners' position is weak and unpersuasive. In view of the state of the record, bearing in mind that the burden of proof is upon the petitioners, we must find that such burden has not been carried by reasonably satisfying evidence. Decision will be entered under Rule 50. Footnotes
*. As a result of the treasury purchases began by Delta in 1965, its outstanding stock as of November 30, 1965 had decreased from 500,000 to 478,734 shares.↩